COCA COLA BOTTLING CO. OF PUERTO RICO, INC., Plaintiff and Appellant, *v.* FERNANDO SIERRA BERDECÍA, SECRETARY OF LABOR OF PUERTO RICO, ETC., Defendants and Appellees; MARIANO RODRÍGUEZ ET AL. and NARCISO VÁZQUEZ DÍAZ ET AL., Interveners.

No. R-62-199.        Decided May 10, 1963.

*Beverley, Castro & Rodríguez Lebrón* for petitioner. *Manuel Janer Mendía* and *Carlos Bastián Ramos* for appellees. *Francisco Aponte Pérez* for interveners.

Division composed of Mr. Chief Justice Negrón Fernández, Mr. Justice Blanco Lugo, and Mr. Justice Ramírez Bages.

MR. JUSTICE RAMÍREZ BAGES delivered the opinion of the Court.

Coca Cola Bottling Co. of Puerto Rico, Inc., appellant herein, filed in the Superior Court of Puerto Rico, San Juan Part, a petition for declaratory judgment alleging that there exists a controversy between the parties in this case with respect to the mandatory decree of the Minimum Wage Board applicable to appellant's operations transacted through its establishments located in different places of the Commonwealth. Appellant maintains that the decrees applicable to its operations, in its factory and principal office situated in the district of Hato Rey in San Juan, Puerto Rico, as well as in its establishments in different places of the Commonwealth, are Mandatory Decrees No. 33, applicable to the food and related products industry (29 R.&R.P.R. §§ 245n–551 to 553) as respects the applicable minimum wage, and No. 5 of that Board (29 R.&.R.P.R. §§ 245n–71 to 75) with re-

spect to the other working conditions. The appellees and the interveners allege, on the contrary, that the operations of appellant's establishments in different places of the Commonwealth are covered by Mandatory Decree No. 34 which defines and covers the wholesaling and warehousing industry for local trade (29 R.&.R.P.R. §§ 245n–561 to 563) with respect to minimum wage, and by Mandatory Decree No. 16 (29 R.&R.P.R. §§ 245n–271 to 278) which governs the wholesale trade in regard to other working conditions.[1]

---

[1] The pertinent provisions of those decrees are the following:
MANDATORY DECREE No. 33 (§ 245n–551):

"(a) This mandatory decree is applicable to all employees of the 'food and related products industry,' as defined below:

"(1) The 'food and related products industry' shall comprise the canning, preserving . . . or any other manufacturing or processing and the packaging in conjunction therewith, of . . . *refreshing beverages*, . . .

. . . . . . . .

"(b) The different classifications of said industry shall have the meanings provided for hereinafter:

. . . . . . . .

"(9) *'Carbonated waters and soft drinks' shall comprise every operation necessary or related to the manufacture of all kinds of soft drinks including carbonated waters.*" (Italics ours.)
In a note on said decree the Minimum Wage Board sets forth that the working conditions which appear in Mandatory Decree No. 5 are applicable to the employees engaged in the manufacture of soft drinks and beverages.
MANDATORY DECREE No. 5 (§ 245n–75):

". . . . . . . .

"(d) *Definition of the industry*. The . . . carbonated water industry to which this decree applies is defined as follows: The . . . soft drinks industry . . . includes, but not as a limitation, every act, process, operation, and service that is necessary, incidental or related to the preparation, production, distribution, or disposal by the manufacturer of any kind of . . . cooling beverage that is prepared with carbonated water."
MANDATORY DECREE No. 34 (§ 245n–561):

"This mandatory decree is applicable to all employees in the 'wholesaling and warehousing industry for the local trade' as defined below:

"(1) The 'wholesaling and warehousing for the local trade' shall comprise . . . manufacturers' sales branches and offices established for the wholesale distribution of their products.

. . . . . . . .

There is no controversy on the facts since they were stipulated by the parties. A brief résumé of those facts is as follows:

Appellant is engaged in the manufacture of soft and carbonated drinks, the industrial plant of which is located in San Juan, Puerto Rico. It sells and distributes the manufactured product in two ways, to wit: (1) through a fleet of trucks—each one of these trucks is operated by a driver-salesman; they leave the factory every day and travel by different routes to the metropolitan zone of San Juan and to other towns in the east of Puerto Rico. Its purpose is to sell the product to the retailer and wholesaler. The driver-salesman not only delivers the orders previously placed with appellant, but also procures other sales of the product, collects the amount of the sales or draws up invoices; with the help of his assistant he unloads the product sold and carries the boxes of empty bottles and credits them to the customer. As soon as the stock in the truck is depleted, he returns to the plant, loads again and repeats this operation every day. (2) In its factory premises as well as in Ponce, Mayagüez, Aguadilla and Arecibo, appellant has established certain deposits or warehouses for part of the production of its factory. Another fleet of trucks supplies the warehouses constantly with appellant's product and picks up the empty bottles and boxes returned by the customers. Other trucks loaded with appellant's manufactured product leave

---

"(3) However, the definition does not include:

.    .    .    .    .    .    .    .

"(b) *the activities of employees engaged in industrial wholesaling and warehousing of products manufactured by their employers in Puerto Rico.*" (Italics ours.)

In a note on this decree the Board states that by reason of the provisions of § 40(b) of the Minimum Wage Act of Puerto Rico (29 L.P.R.A. § 246(k)), the provisions of Mandatory Decree No. 16 relating to maximum hours of work and working conditions are applicable to this industry.

daily from these warehouses to sell the product in the same manner as is done under the distribution and sales proceeding first described.

*"Only when the customer has become short of carbonated drinks and the truck assigned to the route is delayed in covering that route do the retailers and wholesalers call or go to the warehouse or deposit or establishment to get stock directly from it. The product is occasionally sold at the warehouse or deposit or establishment to the consuming public, but in such case not less than a box is sold and the same price is charged as the retailer or wholesaler would charge to the consuming public. The policy of the company is to discourage direct sales to the consumer."* (Italics ours.)

Ninety-eight percent of the product is sold directly to the customer and only 2 percent is sold by and at the warehouse. The personnel of each of these warehouses consists of a clerk, the salesmen, the truck drivers, their assistants, loading and unloading employees, janitor, and a refrigeration mechanic. The central plant keeps a record of the product delivered to each warehouse, and the clerk submits to appellant's factory a daily report of the sales transacted, sends a manager's check for the money collected by the seller and sends in the records of the sales, which serve as a basis to the factory for billing the customer. Lastly, such employee also submits to the factory a daily report of the number of hours worked and the commission earned by the warehouse personnel. The official payroll is prepared weekly in the main office of the factory and the same is sent to each warehouse together with the money needed to pay the personnel. The supervision and administration, the standards, norms and rules for operating these warehouses is the responsibility of the main office of the factory, which hires, discharges and trains the entire warehouse personnel. It is also in charge of the labor-management relations of the warehouses

which are regulated by collective agreements which are negotiated and administered by the main office.

Appellant's manufacturing operation, which is natural and inherent in every manufacturing business, not only consists in the manufacturing operation but it also necessarily includes the distribution and industrial sale of the manufactured product. It is obvious, therefore, that the warehouses in question are but an essential part of the manufacturing business and not an operation separate and apart from it, although some of the warehouses are actually physically situated outside appellant's factory premises. Therefore, unless the mandatory decrees clearly and expressly provide otherwise, the warehouse employees are subject to the same employment and wage conditions as the other employees of appellant's business.

This rule of construction conforms to what is set forth by the Legislative Assembly of Puerto Rico in the declaration of policy of the Minimum Wage Act (29 L.P.R.A. § 245), to the effect that it is the policy of the Commonwealth *"to step up the development of agriculture, industry and business in Puerto Rico . . . and achieve the highest possible wage level compatible with such development, without substantially curtailing employment or impairing the opportunities to obtain the highest wages."* (Italics ours.) In § 15 of the Act (29 L.P.R.A. § 245n) it was provided that *the wages for each industry shall be fixed with due regard to the aforesaid purposes, and that such wages shall be the highest that can reasonably be paid by the industry without substantially curtailing employment and taking into consideration the cost of living and the needs of the employees as well as the economic and competitive condition of the industry in question.* In announcing this policy certain economic realities prevailing in Puerto Rico were unquestion-

ably taken into consideration, such as its high endemic unemployment,[2] its increasing population problem,[3] other con-

[2] "During the past 12 years (1950 to 1962) some 140,000 employments have been created in highly productive activities such as manufacture, construction, government services, etc. Yet, some 150,000 employments have in turn disappeared in agriculture, domestic service, home needlework, and other works of low productivity. Hence, while the gross production of the economy has multiplied, the number of employments has remained stable throughout these years.

"As a result, the unemployment index has not undergone noticeable improvement. In April 1940—the month of peak economic activity in the country by reason of the crop season—11 percent of the Puerto Rican labor force was unemployed; 10 years ago it was 11.3 percent; in April 1962 it was 9.3 percent. The annual average in 1962 was 12.3 percent; in the course of the year an average of 84,000 Puerto Ricans, anxious for an opportunity to work, were unemployed.

"The prospects of improvement in the unemployment rate are not very encouraging. The prospects are that the population may increase suddenly as a result of the reduction in emigration, which will mean that there will be many more hands to be employed in the course of the years.

"The prospects are that the working group will increase to 810,000 in 1970 and to 925,300 in 1975. (In 1962 it was some 670,000.) However, the employment level anticipated for these dates is 709,000 and 823,000 respectively, which imply an increase of 124,000 and 238,000 over the employment level in 1962. In other words, in the next 13 years it will be necessary to create employments at the rate of about 18,000 annually, which compares with the net reduction noted during the past decade. And yet at the end of the period there will be more than 100,000 unemployed Puerto Ricans, who will represent 11 percent of the labor force." Source of information—Economic Studies Office, Economic Development Administration.

[3] "Estimates of population and employment growth:

| | 1960 | 1965 | 1970 | 1975 |
|---|---|---|---|---|
| Population (thousands) | 2,350 | 2,612 | 2,897 | 3,218 |
| Employments (thousands) | 542 | 625 | 709 | 823 |
| Nonagricultural (thousands) | 417 | 513 | 614 | 742 |
| In Development factories (thousands) | 44 | 73 | 110 | 160 |
| Accelerated Development Program (thousands) | | 80 | 121 | 176 |

The latter figure means that by 1975 it shall be necessary to establish about 2,830 factories in Puerto Rico."
Source of information: Official population prospects prepared by the Department of Health and the School of Medicine, adopted by the Planning Board and incorporated in a circular of the president which was sent to the Economic Development Administrator on June 1, 1962. The figure for 1960 is taken from the Census of Population.

ditions of the local situation,[4] and the competition by other undeveloped areas in order that an essential part of the North American and European expansion may be carried out within its territorial limits.[5]

In drawing up and promulgating Mandatory Decree No. 24 (29 R.&R.P.R. §§ 245n–441 to 450) on the beer industry, which was formerly governed by Mandatory Decree No. 5 jointly with the carbonated industry, the Mini-

---

"The estimates of employment are taken from a tabulation of the Planning Board entitled 'Employment by Economic and Industrial Sectors, Historical Series and Prospects.'

"New goals of employment in Development factories, 1965 and 1970, Economic Development Administration, 'Achievements and Prospects of Development Programs, p. 6. Figure for 1975 furnished by OEE, AFE.'"

[4] According to information published by the Economic Studies Office of the Economic Development Administration of Puerto Rico, certain conditions prevail in the Commonwealth, some of which are mentioned below, which do not facilitate its economic development:

1.—The geographical separation from the continent, which requires large inventories and greater communication expenses.

2.—Practically exclusive dependence on only one means of importing raw material and exporting manufactured products, namely, the maritime way, which in the past has been subject to interruptions because of strikes.

3.—The system of periodical revision of minimum wages by industrial committees, which creates a great element of uncertainty on the future operating expenses.

4.—Lack of indispensable "know how".

*Additional note:* Puerto Rico has been enjoying two economic advantages which so far have made its economic development possible, which are the tax exemption which permits the manager to retain the profits *provided he can operate profitably,* and that in many types of manufacture the costs in Puerto Rico have been lower than in other areas due to abundance, training facility, and productivity of our workers.

[5] "Advantages offered by the southern states of the United States:

"1.—Natural resources: accessibility to raw material, low cost of fuel, etc.

"2.—Nearness and accessibility to markets of final consumers as well as of industrial and exportation markets.

"3.—Alternate means of transportation at low cost which provide a highly satisfactory service.

"4.—One hundred percent financing of the physical plant (including machinery and fixtures).

"5.—Lease rentals much more alluring than in Puerto Rico."

mum Wage Board of Puerto Rico clarified the question under consideration as to the beer industry in providing that said Mandatory Decree No. 24 covers not only the operations transacted by the manufacturer in the same premises of the industrial enterprise, but also those transacted in subsidiary premises or establishments. This decree included the activities of distribution, propaganda, disposition or sale by the manufacturer as part of the beer industry. There is no question on the advisability and effectiveness of a regulation which clearly defines its scope not only as to the different phases of the business, but also as to the form and manner of performing the functions of each of the different operations or activities of the industry. That same degree of clarity in the language does not exist with respect to the food and related products industry (which includes carbonated drinks), which is precisely the type of industry which has been most suitable for development by native promoters, inasmuch as a great part of the raw material comes from local sources and its principal market has been the local market. On the other hand, it is the type of industry under most competition, at times unfair, as in the case of foreign producers who sell their products in Puerto Rico at prices lower than in other markets.

The trial court held that appellant's warehouses "are sales branches of the manufacturing enterprise," as this term is defined in Mandatory Decree No. 16, since they are subsidiary establishments of the enterprise, established on premises other than that occupied by the manufacturing enterprise and which are engaged in the distribution at wholesale of the products of such enterprise. This conclusion is based on the fact that it was the intention of the Minimum Wage Board to incorporate and transfer to Mandatory Decree No. 34 the definition contained in Mandatory Decree No. 16.

Appellant alleges that the trial court erred in holding that Mandatory Decrees Nos. 34 and 16 were applicable

to appellant's operations transacted in its establishments throughout the Island.

In order to decide the question it is necessary to determine first which is the definition of appellant's industry in the corresponding mandatory decrees, which is the scope thereof, and how is it affected, modified or limited by the decrees governing the wholesale trade. The initial definition of the carbonated drinks industry is drawn up and included by the Minimum Wage Board in its Mandatory Decree No. 5 of 1944. This definition clearly includes the operations of distribution or disposition of the product, namely, the sales thereof without any limitation whatsoever as to the form and manner of carrying out this activity (footnote 1 of this opinion). In 1949 the Board promulgated Mandatory Decree No. 16 on wholesale trade, and in the definition of this trade it includes "sales branches of a manufacturing enterprise," defining the latter as "a subsidiary establishment of a manufacturing enterprise which does not operate in the same building and which is engaged in the distribution at wholesale of goods produced by said manufacturing enterprise." In its "Findings of Fact, Opinion and Decree" the Board said that this definition does not include the processes carried out by a person or agricultural or manufacturing entity until it delivers its product to the dealer or entity which will sell the same, and, consequently, the definition does not cover manufacturing enterprises but rather the latter's sales branches. The mandatory decree in question defines such branches as: (1) subsidiary establishments of a manufacturing enterprise; (2) which do not operate in the same building; and (3) engaged in the distribution at wholesale of goods produced by said enterprise.

The Minimum Wage Act of Puerto Rico in force since 1956 defined the wholesaling, warehousing and other distribution industry and fixed the minimum wage for the dif-

ferent divisions of the latter, as well as when the work is covered by the Fair Labor Standards Act, and also provided that the Board shall revise the minimum wages, including in the corresponding notice the definition which the Board deems more adequate for the industry concerned (29 L.P.R.A. §§ 246i(J), 245e(b)IV and (d)IV, 245j and 245p).

■■ On October 30, 1957 the Board approved Mandatory Decree No. 33 in which it redefined the food and related products industry (see footnote 1, *supra*) and fixed a wage of 55 cents per hour for the workers of that industry. We have no doubt that the definition of the carbonated and refreshing beverages industry contained in this decree necessarily includes the warehousing, distribution and sale of the product, since these operations are necessary to and related with the manufacture. It is known that every manufacturing operation consists of two principal and basic functions which are the production of an article for commerce and the warehousing, distribution and sale thereof. Lastly, on the above-mentioned date the Board also approved Mandatory Decree No. 34 (amended in 1959) redefining the wholesaling industry, and it provided to that effect that that industry comprises the "sales branches and offices established for the wholesale distribution of their products." However, the definition of that industry in said decree *excludes* "the activities of employees engaged in industrial wholesaling and warehousing of products manufactured by their employers in Puerto Rico." It is evident, and it is so set forth in the economic study made by the Board in connection with Mandatory Decree No. 34, that the scope of this modification is to extend the application of the definition of wholesale trade so as to include not only the sales branches or offices of manufacturers of products manufactured outside of Puerto Rico, but also those of the local manufacturers. However, it is said in that report that the definition does not

include "the warehousing nor the distribution and delivery of the product by the manufacturer in his private ware-houses or establishments situated in the premises of the plant or outside the premises, unless other operations carried out in those warehouses serve as basis to consider that *wholesales or retail sales are being carried on therein, in which case the former shall be covered by the definition and the latter (retail sales) by Mandatory Decree No. 8 (amended) of the Minimum Wage Board.*" (Italics ours.)

The crux of the question in this case consists in determining which is the exact distinction between a "manufacturers' sales branch or office" and "the activities of employees engaged in industrial wholesaling and warehousing products manufactured by their employers in Puerto Rico," which according to Mandatory Decree No. 34 are excluded from its provisions and, hence, are subject to the provisions of Mandatory Decrees Nos. 33 and 5 concerning the carbonated and refreshing beverages industry.

■ In *Secretary of Labor* v. *Borinquen Pasteurizer, Inc.*, 83 P.R.R. 525 (1961), we had occasion to consider facts similar to those in the instant case, except that in that case (1) the warehouse where the soft drinks produced by appellee were stored was closed as soon as the salesmen loaded their trucks with the products from such warehouse and went out in the morning to sell them, and the warehouse was opened again when the trucks returned in the evening; and (2) there was no telephone nor did they receive orders in the warehouse. Under such circumstances we concluded that the warehouse in question was a place for storing bottled drinks in which the same were not sold nor distributed, and, therefore, that such operation was not governed by the mandatory decree covering the wholesale trade. There we made reference to the interpretative memorandum issued by the Department of Labor on September 14, 1950 (No. 8

of Decree No. 16), setting forth therein that the easiest way of distinguishing between the sales made by an industrialist to wholesalers and retailers, denominated "industrial sales," those which are not covered by the decree governing wholesale trade, and the sales which the industrialist may transact as dealer in a subsidiary establishment, denominated "commercial sales," which are governed by that decree, consists in determining whether or not the sales are transacted in a commercial establishment. By commercial establishment is meant premises devoted to the sale and distribution of goods: *an establishment which is ordinarily or daily open to customers and purchasers to carry out sales transactions.* In the case under consideration the warehouses in question remain open in order that the retailers and wholesalers may go to or call at the warehouse in order to get their supply whenever there is an unexpected and isolated need, and occasionally sales are made in the warehouse to the consumers. However, the result is that only 2 percent of the total sales of the warehouses are made by and at the warehouse. The person in charge of each of the warehouses in this case remains therein all day together with the janitor, the refrigeration mechanic and the loading and unloading workers. This situation and the proportion of such sales do not show that it was appellant's purpose to establish and operate, and actually operated, a commercial establishment where sales transactions are carried out usually or daily. Rather, it is evident that deposits or warehouses were established by appellant as a means or instrument of transacting its industrial sales to wholesalers and retailers. The purpose of the minimum sales transacted directly at the warehouses was to meet unexpected and isolated needs of the customers, since it is more convenient and economic for the latter to purchase from the trucks leaving the warehouses than to go to the warehouses directly to make their purchases there.

Unquestionably, for this same reason, appellant has not constituted its warehouses as the commercial sales establishments which the Minimum Wage Board had in mind in modifying in its Mandatory Decree No. 34 the definition of the wholesale trade industry. *Cf. Santana* v. *Blasco*, 78 P.R.R. 623 (1955). We therefore hold that appellant's purpose in establishing and operating its warehouses in the form and manner stipulated was to carry out an essential part of its manufacturing business, which is the distribution and delivery to its customers of its manufactured product through "industrial sales," those warehouses constituting an integral part necessary and essential to its manufacturing business. In our opinion, according to the stipulation of facts, appellant did not use its warehouses as commercial establishments in accordance with the usual and current business practice (1) of inducing and encouraging the customers to call at the establishment to make their purchases and to place their orders, and, in general, to transact business with appellant, and (2) to promote and procure freely and without restrictions the transaction of sales directly to the public at such establishments. This conclusion does not conflict with the view stated in *Comm'r of Labor* v. *San Miguel Fertilizer Co.*, 73 P.R.R. 327 (1952), since in this case the facts stipulated showed that the establishment in question was constituted by two different manufacturers in the form of a branch to sell therein their different products directly to farmers for use in their respective farms and not for resale purposes. The question for decision in that case was whether the work performed in that branch was covered by Mandatory Decree No. 8 which governs the retail trade, or, as alleged by complainant, whether such work was covered by Mandatory Decree No. 16 covering the wholesale trade. We held that Mandatory Decree No. 8 was the applicable decree. At no time was it alleged or questioned nor was it stipu-

lated that the employers were transacting industrial sales at the said branch. In *Commissioner of Labor* v. *Llamas*, 73 P.R.R. 847 (1952), we held that ice plant workers engaged in selling the product directly to the consumers are covered by Mandatory Decree No. 8 governing retail sales. In this case such sales were not transacted in a commercial establishment separate and apart from the factory, but directly from the factory. We said on that occasion, and therein lies the fundamental distinction between that case and the case under consideration, that:

"Paragraph A, subdivision 1, of Mandatory Decree No. 8 includes retail sales made in any establishment or place totally or partially destined for such purposes. Not only is it fair to state that defendant's plant is partially engaged in selling ice to consumers but that actually the main purpose of said plant is to sell directly to consumers. The plant would be of no importance without those retail sales. Paragraph A, subdivision 1, does not exclude employees who are engaged in retail business solely because articles thus sold are made in their employer's factory. Said provision has a wide scope, and the judge must not supply an exclusion where the Decree does not provide it, especially if the Decree includes all the employees who are engaged in retail business. For the foregoing reasons, said paragraph A, subdivision 1 applies to the worker's involved herein."

■ For the reasons stated, the judgment is reversed and it is held that appellant's workers who perform their tasks in or from the warehouses which it has established and operates in connection with the industrial sales of its manufactured product are covered by Mandatory Decrees Nos. 33 and 5 and not by Mandatory Decrees Nos. 34 and 16 of the Minimum Wage Board of Puerto Rico.